# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

CASSANDRA KINNEY,

     **Plaintiff,**

vs.

     CASE NO.: 3:17-cv-419-J-32JRK

JACKSONVILLE SHERIFF'S
OFFICE,

     **Defendant.**

_____ /

## COMPLAINT
## DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff, Cassandra Kinney, by and through her attorney, and brings this lawsuit seeking injunctive and declaratory relief, and monetary damages against The Jacksonville Sheriff's Office ("JSO") for violations of Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Defendant failed to provide effective communication, and denied Plaintiff full and equal enjoyment of Defendant's services, facilities and privileges. Defendant also failed to make reasonable modifications in policies, practices, and procedures, and failed to train personnel to work effectively with deaf citizens and inmates. Plaintiff has suffered humiliation, degradation and discrimination in violation of her civil rights through Defendant's policies and practices of discrimination on the basis of her disability.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over the actions pursuant to 28 U.S.C. §§ 1331, 1343, for the Plaintiff's claims arising under Section 504 and the ADA.

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) -

(b)(2) because, (1) the Defendant is located in this district, and or (2) a substantial part of the

events or omissions giving rise to Plaintiff's claims occurred and are occurring within this

district.

## PARTIES

**PLAINTIFF**

3.     Plaintiff, Cassandra Kinney ("Ms. Kinney"), is profoundly deaf and has great

difficulty reading or writing English, she cannot speak nor lip-read effectively, and uses

American Sign Language ("ASL") to communicate. Ms. Kinney is a qualified individual with a

disability within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12131(2) and

the Rehabilitation Act, 29 U.S.C. § 794. She was at all times relevant a resident of Duval

County, Florida.

**DEFENDANT**

4.     Defendant, Jacksonville Sheriff's Office ("JSO") is a municipal subdivision of

the City of Jacksonville, and responsible for law enforcement, investigation, and corrections

within the consolidated City of Jacksonville and Duval County, Florida. The JSO is comprised of

the Department of Corrections, Department of Investigations and Homeland Security,

Department of Patrol and Enforcement, Department of Personnel and Professional Standards and

the Department of Police Services. JSO is a public entity within the meaning of 42 U.S.C. §

12131(1).

5.     JSO receives federal financial assistance within the meaning of the Rehabilitation

Act, 29 U.S.C. § 794(a). The operations of the Correctional Treatment Facility are programs or activities within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(b)(1)(A)-(B).

## FACTUAL ALLEGATIONS

### Jacksonville Sherriff's Office, Violations of the ADA and Section 504

6.      In 2007, seven (7) deaf citizens filed complaints with the United States Department of Justice ("DOJ") against the Consolidated City of Jacksonville regarding the Jacksonville Sheriff's Office ("JSO"). The complaints alleged that JSO violated Title II of the Americans with Disabilities Act, and the Department's regulation implementing Title II, 28 C.F.R. Part 35, by denying effective communication for individuals who are deaf.

7.      As a result, the JSO entered into an Agreement to correct a number of deficiencies and agreed to: providing appropriate auxiliary aids and services (including qualified interpreters); give *primary* consideration to the requests of the individual with a disability; to contract with one or more qualified oral/sign language interpreter agencies to ensure that interpreting services will be available on a priority basis, twenty-four hours per day, and seven days a week; provide at least one teletypewriter (TTY)[1] for use by the staff, public, or detained persons at every police station or substation and every detention facility, and provide annual training for its officers about how to communicate effectively with persons who are deaf or hard of hearing. This agreement was in effect until 2010. *Found at* https://www.ada.gov/jacksonvillefla.htm (last visited March 28, 2017).

---

[1]A teletypewriter ("TTY") is an archaic device that allows the user to type messages back and forth instead of speaking. A TTY user can communicate with a person using a standard telephone via a third party relay service that relays the messages back and forth between the parties by typing and speaking.

8.     In 2013, the DOJ initiated a compliance review of the City of Jacksonville under Title II of the Americans with Disabilities Act, and under the authority of Section 504 of the Rehabilitation Act. The review included access for persons with disabilities to physical structures along with access to programs, services, and activities to include the Jacksonville Pre-Trial Detention Facility, Office of the Sheriff/Community Corrections Division, and the Police Memorial Building.

9.     Pursuant to the 2013 Agreement the JSO was required to inter alia: implement a policy statement on effective communication with people who are deaf or hard of hearing; distribute to all JSO officers the *Guide for Law Enforcement Officers When in Contact with People Who are Deaf or Hard of Hearing;* to continue to contract with one or more local qualified oral/sign language interpreter agencies to ensure that the interpreting services will be available on a priority basis, twenty-four hours per day, seven days a week, and to continue to ensure that each Sheriff's Office station or substation and each jail and detention facility is equipped with a working TTY to enable persons who are deaf/ hard of hearing to make outgoing telephone calls. This section of the Agreement is in effect until 2018. *See Settlement Agreement between the United States of America and City Of Jacksonville, Florida,* DOJ 204-17M-398, *Found at* https://www.ada.gov/jacksonville_pca/jacksonville_pca_sa.htm (last visited March 28, 2017).

10.     The JSO has long been put on notice of the need to accommodate deaf and hard of hearing citizens accessing their services, and the need to ensure staff are trained accordingly.

## FACTUAL ALLEGATIONS OF CASSANDRA KINNEY

11.     Plaintiff, Cassandra Kinney ("Ms. Kinney"), is a profoundly Deaf individual, she cannot speak, or lip-read. She uses American Sign Language ("ASL") to communicate effectively. Ms. Kinney cannot read or write English well, therefore writing and reading is not an effective form of communication for Ms. Kinney.

12.     Ms. Kinney also has intellectual disabilities, and her adaptive functioning is at a second grade level. Ms. Kinney does not have a great deal of world experience and when compounded with her deafness she can be easily exploited. She has also been diagnosed with asthma and a seizure disorder.

13.     Ms. Kinney moved from the state of Washington to Jacksonville, Florida upon the invitation of friends who offered her a place to stay approximately in July of 2015. In Washington she held the same job for about six and a half (6.5) years, and maintained stable housing. Although Ms. Kinney was diagnosed with depression as a child, Ms. Kinney had never been involuntarily committed, and had not been on medication for approximately six (6) to seven (7) years.

14.     The exploitation and control of Ms. Kinney by her roommates and others began soon after her arrival to Florida. The residence where Ms. Kinney lived was prone to conflict, and Ms. Kinney was often the victim of manipulation, and exploitation due to her lower intelligence level.

15.     *First Involuntary Examination* - On approximately August 29, 2015, there was an argument at the home of Ms. Kinney, and her roommates called JSO to have Ms. Kinney involuntarily evaluated. The roommate told Ms. Kinney it would be a *good idea* for her to talk to

someone. Ms. Kinney did not understand the ramification of calling law enforcement under this context. Ms. Kinney was hoping JSO would talk with her so she could better understand the process.

16.     When JSO[2] arrived Ms. Kinney gestured that she was deaf. JSO spoke to Ms. Kinney's roommates, who although they are deaf, can hear, and speak to some degree. The JSO wrote to Ms. Kinney, but failed to communicate with Ms. Kinney effectively in a bidirectional way. Ms. Kinney made best efforts to tell the JSO Officers she was fine, and any comments of self-harm she made during the argument were nonsense.

17.     Pursuant to Fla. Stat. § 394.463 "A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness: (a) 1. The person has refused voluntary examination after conscientious explanation and disclosure of the purpose of the examination; or 2. The person is unable to determine for himself or herself whether examination is necessary; and (b) 1. Without care or treatment, the person is likely to suffer from neglect or refuse to care for himself or herself; such neglect or refusal poses a real and present threat of substantial harm to his or her well-being; and it is not apparent that such harm may be avoided through the help of willing family members or friends or the provision of other services; or 2. There is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior."

---

[2]According to the police reports, the officers who responded to the 911 calls, coded as mental health calls, worked in Zone Four (4) of JSO's Patrol Districts.

18.     The JSO failed to call an interpreter, and or transport Ms. Kinney three (3) miles to use the 24-hour video remote interpreting services located at the JSO substation.[3] Ms. Kinney went voluntarily with the JSO, because her roommate told her she had to go.

19.     The JSO officer handcuffed Ms. Kinney behind her back, which prohibited her from speaking by way of ASL, and she was placed in the police vehicle. JSO then transported Ms. Kinney approximately six (6) miles away to the Mental Health Center of Jacksonville ("MHCJ") for an involuntary examination. Ms. Kinney, on information and belief has never been involuntarily committed ("Baker Acted") before.

20.     Unlike the JSO, MHCJ secured an ASL interpreter. Upon evaluation MHJC noted that patient [Ms. Kinney] reports, "She wanted to go into her room, but they prevented her." "She is upset and feels her rights were violated. The police officer did not communicate with her through an interpreter. Instead they listened to her roommates and Baker Acted her." MHCJ quickly determined Ms. Kinney did not meet the criteria for a Baker Act commitment and was released.

21.     *Second Involuntary Examination* - On October 6, 2015, Ms. Kinney was physically not feeling well, and her roommate started picking on her. 911 was called, and when the JSO arrived, according to the police report, JSO relied on the statements of her roommate who said Ms. Kinney wanted to kill herself.

---

[3] According to the JSO website the "JSO uses DEAF LINK to assist the deaf and hearing impaired community. If a deaf or hearing impaired citizen stops a police officer to report a crime or have a conversation, and cannot communicate, the citizen can be brought to the nearest substation (or to the Police Memorial Building or the Pre-Trial Detention Facility). DEAF LINK allows immediate communication with a sign language interpreter through the computer (24 hours a day, seven days a week)." *Found at http://www.coj.net/departments/sheriffs-office.aspx* (last visited March 28, 2017).

22.     Ms. Kinney asked the officer for an interpreter, but JSO denied the request. Due to the absence of effective bidirectional communication Ms. Kinney was unable to explain that the roommates were picking on her. The police report reflects Ms. Kinney wrote she "was ok and did not need help."

23.     Ms. Kinney was not hurting herself, hurting others, or threatening to hurt herself or others. JSO failed to call an interpreter, and or transport Ms. Kinney three (3) miles to use the 24-hour video remote interpreting services located at the JSO substation.

24.     According to the Police Report a "JSO engine search revealed the subject [Ms. Kinney] was Baker Acted on August 29, 2015 for making suicidal threats." On information and belief, JSO used the erroneous transport on August 29, 2015 as a red flag to support a subsequent involuntary evaluation instead of relying on the criteria of the Florida involuntary examination statute which envisions speaking directly to the person, and in this case through a qualified and *neutral* interpreter.

25.     Ms. Kinney was handcuffed, placed in the police vehicle and transported six (6) miles away to MHCJ again.

26.     Unlike the JSO, again MHCJ secured an ASL interpreter and their notes reflect that patient told MHCJ that "she claims they [roommates] ganged up on her. As a result she was handcuffed and brought here. She complains the police violated the rules. She was entitled to have an interpreter, and they did not do it." Ms. Kinney further explained that she was just having an argument with her roommate.

27.     Upon an evaluation, the MHCJ promptly determined Ms. Kinney did not meet the Baker Act commitment criteria, and was released.

28. *Third Involuntary Examination* - On January 1, 2016, one of Ms. Kinney's roommates began picking on her again, and an argument ensued. When Ms. Kinney tried to run from the roommate, she tripped over the lamp cord causing electrical sparks to be produced near the wall. 911 was called. Ms. Kinney was hoping the JSO could help her, because she was a constant target of her roommates.

29. When JSO arrived Ms. Kinney asked for an interpreter, but the request was denied. Ms. Kinney was not hurting herself, hurting others, or threatening to hurt herself or others. JSO failed to call an interpreter, and or transport Ms. Kinney three (3) miles away to use the 24-hour video remote interpreting services located at the JSO substation.

30. The JSO Officer did not speak to Ms. Kinney, and instead limited the interview to her roommate Joseph McCauley, who has a hearing loss but can speak. According to the police report, Mr. McCauley told the officer Ms. Kinney tried to commit suicide a few days earlier, and that today she tried to electrocute herself with an electrical cord.

31. Due to JSO's failure to provide effective bidirectional communication Ms. Kinney was again taken for an involuntarily examination approximately eight (8) miles away to Orange Park Medical Center ("OPMC").

32. Unlike the JSO, OPMC secured an ASL interpreter for Ms. Kinney and upon an evaluation found, she did not meet the criteria for an involuntary commitment, and was released.

33. Ms. Kinney began to realize that her roommates wanted her out of the apartment. However, Ms. Kinney felt trapped because her name was on the lease, and she had nowhere to live, and no money to move since coming from Washington.

34.     *Fourth Involuntary Examination* - On January 5, 2016, her roommates began picking on Ms. Kinney again, an argument ensued, and 911 was called.

35.     Upon arrival of JSO, Ms. Kinney asked JSO for an interpreter to communicate in a bidirectional manner, but the request was denied. Ms. Kinney was not hurting herself, hurting others or threating to hurt herself or others. JSO failed to call an interpreter or take Ms. Kinney approximately three (3) miles away to use the 24-hour video remote interpreting services located at the JSO substation.

36.     Ms. Kinney again, was handcuffed, and then transported ten (10) miles to MHCJ.[4] Ms. Kinney was admitted to the unit, but MHRC's notes reflect that MHRC called her roommate who told MHRC "He felt it would be good idea to keep her overnight because she had talked about wanting to hurt herself on a couple of occasions, although not attempted." Ms. Kinney requested immediate release from MHRC, stating she was just having difficulty with one of the roommates. Her request was denied.

37.     Ms. Kinney arrived at MHRC at approximately 2:50 a.m. on January 5, 2016, and was released the next day by approximately 11:00 a.m.

38.     *Fifth Involuntary Examination* - On January 19, 2016, one of Ms. Kinney's roommates became violent with her, and a fight ensued. Again, the JSO were called to the home. Ms. Kinney requested an interpreter for effective bidirectional communication, but the request was denied. Upon arrival, the officer relied on the information from the roommate, and failed to speak to Ms. Kinney directly.

---

[4]Also known as Mental Health Resource Center North ("MHRC").

39.     Ms. Kinney was not hurting herself, hurting others or threating to hurt herself or others. JSO failed to call an interpreter, or transport Ms. Kinney approximately three (3) miles away to use the 24-hour video remote interpreting services located at the JSO substation or the main station. The officer handcuffed Ms. Kinney to transport her for another involuntary examination.

40.     Due to the four (4) former erroneous involuntary evaluations, and that fact that JSO always denies her request for an interpreter, Ms. Kinney protested more forcefully. Her actions exacerbated her asthma condition, and she fell to the ground. Due to the inability to communicate effectively, officers interpreted her actions as a "fake seizure". Ms. Kinney was then transported ten (10) miles away to MHRC.

41.     Unlike the JSO, MHRC secured an interpreter and upon evaluation found Ms. Kinney required medical assistance for her shortness of breath, and was taken to a local hospital. After being cleared to return to MHRC, she was later evaluated, and failed to meet the Baker Act criteria, noting, "keeping her there against her will is not going to be fruitful but rather traumatize her more." The MHRC notes reflect that Ms. Kinney said she had a disagreement with a roommate, and it was the roommate who was violent and called the JSO, but blamed Ms. Kinney. Ms. Kinney told MHRC "She admits she got violent because the police did not pay attention to her and handcuffed her so she got mad."

42.     *Sixth Involuntary Examination* - On January 31, 2016, Ms. Kinney's roommate got drunk, tried to choke Ms. Kinney, and a fight ensued. One of the roommates called JSO, and according to the police report, the officer relied on the information from the roommate and failed to speak to Ms. Kinney directly. Ms. Kinney was very upset because she knew that the JSO

Officers would not speak to her, and would instead rely on her roommates who were trying to get rid of her. The roommate told the officer Ms. Kinney was not taking her ADHD medicine, and that she wanted to hurt herself. It is true that Ms. Kinney was not taking her ADHD medicine, but that was because she stopped taking the medicine approximately six (6) years earlier.

43.     To avoid another false detention at a mental health center this time Ms. Kinney ran out of the house. The officers detained Ms. Kinney, and tightly put the handcuffs on behind her back. Due to the pain from the handcuffs, and the inability to communicate in sign language, Ms. Kinney began to scream to garner help with the tight handcuffs, and out of frustration. The officers saw her actions as a sign of defiance.

44.     Ms. Kinney was not hurting herself, hurting others or threating to hurt herself or others. JSO failed to call an interpreter, or take Ms. Kinney approximately three (3) miles away to use the 24-hour video remote interpreting services located at the JSO substation or to the main station. Ms. Kinney was instead transported ten (10) miles away to MHRC for an involuntary examination.

45.     Unlike the JSO, MHRC secured an interpreter for Ms. Kinney. The MHRC notes reflect that in essence due to the fact that she had been there four (4) or five (5) times in the past she would need to be observed for para suicidal, dangerous, or unsafe behavior, and if she did not exhibit that behavior she would be released—which she was.

46.     On approximately February 1, 2016, Joseph McCauley, Ms. Kinney's roommate, filed for an Injunction for Protection ("IFP") against Ms. Kinney. Ms. Kinney alleges it was an attempt to get her out of the apartment. Although JSO had been to the residence many times

before, when they arrived to serve Ms. Kinney the IFP on February 3, 2016 they failed to provide an ASL interpreter. When served the documents Ms. Kinney gestured that she could not read or understand the IFP. The officer failed to secure an interpreter for her, or drive the three (3) miles to access the 24-hour video remote interpreting services at the JSO substation, and instead used the roommate who filed the IFP against her as the interpreter. Ms. Kinney felt outnumbered and victimized, and was unable to ask the officer any questions because JSO was using the person who had been controlling her as the interpreter. Ms. Kinney was told she must leave the home immediately. Ms. Kinney was upset, and wanted to inquire further because she had just paid the rent at the apartment, had no place to go, and no place to bring her cat.

47.      At the IFP hearing Ms. Kinney was told she could go back to the apartment to pick up her belongings. However, Ms. Kinney did not understand the *no contact through third parties* provision of the IFP. Ms. Kinney contacted Mr. McCauley's wife to arrange to pick up her items with a police escort. Ms. Kinney then received a Facetime call from the wife of Mr. McCauley to arrange to pick up her belongings. As a result, Mr. McCauley called the JSO and told them Ms. Kinney was violating the IFP by contacting his wife. At this time, Ms. Kinney was homeless, living at the Trinity Rescue Mission Homeless Shelter ("Trinity") in Jacksonville, and working with a deaf pastor, Pastor John Olson, to get needed help.

48.      On February 17, 2016 JSO went to Trinity, without an ASL interpreter, to arrest Ms. Kinney for violating the IFP, but Ms. Kinney was with Pastor Olson at another location. A Trinity employee called Pastor Olson and advised the JSO was there to arrest Ms. Kinney for violating the IFP. Pastor Olson, knowing what Ms. Kinney had already gone through due to JSO's ongoing failure to secure interpreters for Ms. Kinney, immediately told the employee to

tell JSO Ms. Kinney was deaf and required an interpreter. Pastor Olson also told the employee to tell the JSO they would call JSO once they returned to Trinity with Ms. Kinney, and an ASL interpreter would be needed for the potential arrest.

49.     At approximately 8.00 p.m. Trinity called the JSO to let them know Ms. Kinney had returned, and they could come to talk to Ms. Kinney. During that call, Pastor Olson reminded the JSO again that an ASL interpreter was needed for Ms. Kinney. JSO returned to Trinity at approximately 11.00 pm, three (3) hours later, without an ASL interpreter.

50.     JSO attempted to use Pastor Olson as the interpreter, and Pastor Olson vehemently refused. In the police report JSO notes "The subject [Ms. Kinney] does not read well and has a learning disability. She is deaf and only signs. The suspect did not understand the Injunction for Protection Order in which she signed in court." The officer then read Ms. Kinney her Miranda Rights without an interpreter.

51.     Pastor Olson was very concerned for Ms. Kinney, and asked the officer if an interpreter would be provided at the jail for processing and subsequent confinement. Pastor Olson was told the JSO had some kind of a "machine thing" and not to worry. Ms. Kinney was handcuffed and taken to the jail.

52.     Ms. Kinney was incarcerated for almost two (2) weeks, and was never provided an interpreter.

53.     Ms. Kinney requested an interpreter upon her arrival at the jail, but was not provided effective communication for the initial processing, housing assessment, and medical assessment classification. Ms. Kinney was also denied access to group sessions at the jail due to JSO's refusal to provide an interpreter.

54.    Upon her arrival and during her incarceration Ms. Kinney was provided a series of forms for execution, but she did not understand the forms and asked for an interpreter. Her requests were denied. Ms. Kinney was given an inmate handbook, but she was unable to read the book because it was only provided in written English, and not explained through an interpreter, or by way of ASL.

55.    During Ms. Kinney's incarceration, she required medical care, but was unable to correctly fill out the forms, and as a result medical treatment was denied. JSO also required Ms. Kinney to submit to medical testing, but Ms. Kinney did not know the nature of the tests being performed upon her.

56.    Ms. Kinney felt isolated and alone in jail, and was unable to communicate. She requested to talk to someone in the mental health unit. Ms. Kinney was transferred to the mental health unit, and received a psychiatric evaluation, but it was performed without an interpreter. Instead, the JSO forced Ms. Kinney to write back and forth with the evaluator, which was not effective and defeated the purpose of engaging in a cathartic conversation about how she was feeling. Ms. Kinney made her best effort to communicate with the mental health evaluator by writing, but it was too difficult for her, which exacerbated her feeling of isolation. JSO notes that Ms. Kinney is "deaf & mute" and "crying" and "seeking help". Ms. Kinney remained on the mental health floor for approximately four (4) days, stuck in her cell, with no interpreter to help communicate. In the end, the transfer to the mental health unit made things worse for Ms. Kinney, and she wanted to go back to general population so that she would not be so isolated.

57.    The JSO failed to provide effective alerting devices for Ms. Kinney to let her know when it was time for meals, and Ms. Kinney missed meal calls.

58.     Ms. Kinney was denied equitable access to telecommunication services while incarcerated. The jail offered an antiquated TTY device, but Ms. Kinney was unable to successfully place calls outside of the facility because the device was not working. Ms. Kinney asked for a videophone (VP), which is more commonly used by deaf people, but the JSO did not have a VP, or any other effective and equitable means for her to place telephone calls. As a result, Ms. Kinney was unable to place calls to her family or friends, or call for help with bail. The non-deaf inmates freely used telephones placed throughout the jail, however that access was not provided to Ms. Kinney. Moreover, when Ms. Kinney attempted to place calls on the antiquated TTY device, she had to ask permission, and then be taken to a special room to use the device whereas the non-deaf inmates did not have such telephone restrictions.

59.     JSO failed to provide effective communication to train Ms. Kinney on the use of the commissary services which appear to be controlled by way of a kiosk. During her incarceration the combination of not being able to utilize the telephone to call people to put money in her commissary account, and JSO's failure to explain use of the kiosk resulted in her being denied access to commissary service.

60.     The JSO has failed to train its patrol officers, supervisors and detention personnel as to the rights and required accommodations for persons who are deaf or hard of hearing.

61.     Ms. Kinney, and others on her behalf, made affirmative and repeated requests for reasonable modifications and accommodations for her as a deaf citizen and detainee from the JSO, which have been denied. JSO is aware of the federally protected rights of Ms. Kinney and the requirement to accommodate because they are currently under a Settlement Agreement with the DOJ for these same types of violations.

62.     Ms. Kinney has suffered and will continue to suffer pain, anguish, and emotional distress from the pattern of intentional, ongoing discriminatory treatment from the JSO. Ms. Kinney shall continue to use JSO services, as a citizen should she place a 911 call, or require other assistance as a victim or a witness.

## Count One

### Violations of Title II of the Americans with Disabilities Act

63.     Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint in paragraphs one (1) through sixty-two (62).

64.     In Count One, Plaintiff seeks declaratory relief, permanent injunctive relief and monetary damages pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., and its implementing regulations.

65.     The Plaintiff is deaf, cannot speak and has been diagnosed with an Intellectual Disability. These disabilities substantially limit major life activities as defined by Title II of the ADA. Plaintiff meets the essential eligibility requirements for Defendant's services at all times material hereto and is entitled to the protections of the ADA under 42 U.S.C. § 12132, *et seq.*, and its implementing regulations.

66.     JSO is a public entity pursuant to 42 U.S.C. § 12131 (1) (B) and is subject to the mandates of Title II of the ADA and its implementing regulations.

67.     No qualified person with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132.

68. JSO must provide effective auxiliary aids to ensure deaf and hard of hearing people can access their services. The term auxiliary aids and services include qualified interpreters, or other effective methods of making aurally delivered materials available to individuals with hearing impairments. 42 U.S.C. § 12103 (1) (A).

69. Defendant fails to give primary consideration to the requests of individuals with disabilities in determining what auxiliary aids and services are necessary. 28 C.F.R. § 35.160(b)(2).

70. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. § 35.160 (b) (2).(Emphasis added).

71. The term qualified interpreter is defined in the regulation to mean "...an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104.

72. Plaintiff has been injured and aggrieved by, and will continue to be injured and aggrieved by Defendant's discrimination.

**WHEREFORE**, Plaintiff requests the relief set forth below.

<u>**Count Two**</u>

<u>**Violations of Section 504 of the Rehabilitation Act of 1973**</u>

73. Plaintiff realleges and incorporates by reference the allegations set forth in this Complaint in paragraphs one (1) through sixty-two (62).

74.     Plaintiff in this matter requests declaratory relief, permanent injunctive relief, and seeks monetary damages pursuant to Section 504.

75.     Plaintiff is deaf and her disabilities substantially limit major life activities, and are therefore considered to be individual with a disability under Section 504. Plaintiff is otherwise qualified under Section 504 because she meets the essential eligibility requirements for Defendant's services at all times material hereto.

76.     In Count Two, Plaintiff alleges Defendant discriminates against people with disabilities in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in Section 705 (20) of this title, shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

77.     Defendant is a recipient of federal financial assistance, and therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Defendant has discriminated against Plaintiff on the basis of her disability in violation of 29 U.S.C. § 794 and its implementing regulations as more fully described in Count One. Such discrimination includes but is not limited to failure to: provide auxiliary aids and services, modify policies and procedures to prevent discriminatory exclusion from and or denial of services, and ensure that communication with Plaintiff was as effective as communications with non-disabled people.

78.     Defendant's actions were intentional and violated the rights of the Plaintiff by their refusal to reasonably accommodate Plaintiff, even after Defendant has been put on full notice of their obligations to abate such discriminatory actions.

79.     As a result of Defendant's actions described above, Plaintiff suffered and continues to suffer, and will in the future suffer irreparable loss and injury including, but not limited to degradation, humiliation, embarrassment, emotional distress, and a deprivation of her rights to non-discrimination on the basis of her disabilities.

## Relief Requested for Count One and Count Two

**WHEREFORE,** Plaintiff requests on Count One and Count Two the following relief:

A.     That the Court assume jurisdiction;

B.     That the Court enter a declaratory judgment that the actions of the Defendant described in this Complaint be in violation of the ADA, and Section 504 of the Rehabilitation Act;

C.     Enter a permanent injunction for the Plaintiff enjoining Defendant, its successors, agents and employees, and all other persons in concert therewith, from taking or continuing any action which has the purpose or effect of discriminating against the Plaintiff on the basis of failing to effectively communicate and thereby provide services in violation of the ADA and Section 504 of the Rehabilitation Act;

D.     Award monetary damages to Ms. Kinney for her degradation, mistreatment, and humiliation;

E.     Award reasonable attorney's fees, expenses and costs of suit; and

F.     Grant such other relief as the Court may deem equitable and just under the circumstances.

## JURY DEMAND

Plaintiff demands trial by jury on all issues which can be heard by a jury.

Date: April 10, 2017.

Respectfully submitted,

*/s/ Sharon Caserta*
Sharon Caserta, Esq.
Florida Bar No.: 0023117
Morgan & Morgan
Deaf /Disability Rights
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
Videophone: (904) 245-1121
Voice: (904) 361-0078
Facsimile: (904) 361-4305
scaserta@forthepeople.com
*Trial Counsel for Plaintiff*